UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHARLES A. BENSON,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT GEIGER, JOHN DRUMMER,<br>GEOFFREY NORTON, CARY YOUNG,<br>PAUL A. SHRAWDER, and SHANNON<br>HUGHES,<br><br>    Defendants. | CAUSE NO.: 3:17-CV-865-JD |

OPINION AND ORDER

Charles A. Benson, a prisoner without a lawyer, is proceeding in this case against six defendants. "[A]gainst John Drummer and Robert Geiger in their individual capacities for compensatory and punitive damages for using excessive force against him on January [30],¹ 2016, in violation of the Fourth Amendment . . .." ECF 13 at 4. "[A]gainst Geoffrey Norton in his individual capacity for compensatory and punitive damages for failing to protect him from John Drummer and Robert Geiger on January [30], 2016, in violation of the Fourth Amendment . . .." *Id.* "[A]gainst Cary Young, Paul A. Shrawder, and Shannon Hughes in their individual capacities for compensatory and punitive damages for denying him medical treatment for more than five hours on January [30], 2016, in violation of the Fourth Amendment . . .." *Id.*

---

¹ Due to a scrivener's error, the screening order mistakenly indicated these events happened on January 11, 2016.

The Defendants moved for summary judgment. ECF 157. Benson filed a response. ECF 170. The Defendants filed a reply. ECF 173. Benson filed a sur-reply which the Defendants moved to strike. ECF 176 and 177. Benson filed a response to the motion to strike and the Defendants filed a reply. ECF 178 and 179. These matters are now ripe.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit . . .." *Springer v. Durfiinger*, 518 F.3d 479, 484 (7th Cir. 2008).

## I. EXCESSIVE FORCE CLAIMS AGAINST
## JOHN DRUMMER AND ROBERT GEIGER

In the summary judgment motion, defendants Robert Geiger and John Drummer deny they used excessive force against Charles Benson in violation of the Fourth Amendment.[2] ECF 158 at 2. The question in Fourth Amendment excessive use of force cases is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Rather, the question is "whether the totality of the circumstances" justifies the officers' actions. *Graham* at 396. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the perfect vision of hindsight. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id*.

There are a number of events which occurred before Benson was handcuffed on the ground. However, none of them are relevant to this excessive use of force claim which is alleged to have occurred after he was handcuffed on the ground. It is undisputed that Officer Drummer "immediately handcuffed . . . Charles Benson when he arrived on the scene." Drummer Affidavit, ECF 157-2 at 2, *see also* Benson Deposition,

---

[2] The Defendants note Benson alleged a Fourteenth Amendment violation in his amended complaint. ECF 158 at 2, *see* ECF 9. However, they make no mention that pursuant to 28 U.S.C. § 1915A, he was only granted leave to proceed on Fourth Amendment claims and that all other claims were dismissed. ECF 13 at 4.

ECF 168 at 24. It is also undisputed Drummer "then asked Mr. Benson where he was shot. Mr. Benson said that he thought he was hit in his right leg. I took Mr. Benson's pants down and checked him for injuries [and] found no gunshot wounds." Drummer Affidavit, ECF 157-2 at 2, *see also* Benson Deposition, ECF 168 at 25.

It is at this point the parties disagree about what happened next. Geiger denies kicking Benson. Geiger Affidavit, ECF 157-1 at 5. Drummer denies putting his foot on Benson's neck. Drummer Interrogatory Answer, ECF 170-4 at 21. Drummer affirms Benson "kept trying to get up and I restrained him by holding him down on the ground." Drummer Affidavit, ECF 157-2 at 3. Benson describes events after he was handcuffed quite differently. Benson declares under penalty of perjury that, "[o]n January 30, 2016, after Officer John Drummer and Robert Geiger placed me in handcuffs not at any point an time did I ever resist an officer(s) not once." Benson Declaration, ECF 170-4 at 91.

> After being searched by Ofc. Drummer by pulling my pants down to my knees or ankles to see if I was shot, I was then laying on my stomach and there was a brief moments pause, then that's when John Drummer placed his foot on the back of my neck. That's when I instantly and as well simultaneously started getting kicked in my face from my right side I then started to yell and pain per kick and as I tried turning my face to the left to avoid the kicks which at that point, Ofc. Drummer applied more force with his foot pressed against my neck causing me to say repeatedly and continuously say and yell, I CAN'T BREATHE, I CAN'T BREATHE.

Benson Declaration, ECF 170-4 at 91-92. "The assault happened within the first couple of minutes after Ofc. Drummer arrived . . .." ECF 170-2 at 2. This is the only instance of excessive force at issue in this case.

4

During his deposition, Benson testified that, "I was on the ground and in handcuffs, and . . . somebody pulled my pants down, you know, because I think I told them I got shot [and] they pulled my pants back up, told me to turn back over . . . and before I know it an officer put a – put their foot on the back of my neck, and somebody started kicking me, from my right side, in my face and my nose." Benson Deposition, ECF 168 at 24-26. Because of the contradictory statements by the parties, there is a genuine issue of material fact as to the excessive use of force claims which cannot be resolved on summary judgment.

Geiger and Drummer argue they can use necessary force to effectuate an arrest. ECF 158 at 3. That is true. *See Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016). However, they are accused of using excessive force after Benson was handcuffed, on the ground, and not resisting. The factual dispute about what happened immediately after Benson was handcuffed must be resolved by a jury, not on summary judgment.

Geiger and Drummer argue the paramedic records at the scene did not record any facial injuries. *See* ECF 157-10 at 4. However, they acknowledge another medic in a later examination noted "some swelling and redness to the bridge of his nose." ECF 157-10 at 8. They do not mention a facial CT scan taken that evening showed "a definite nasal bone fracture." ECF 170-4 at 79. Rather, they argue video shows Benson did not mention a facial injury even though he mentions other medical concerns when he was twice examined by paramedics immediately after he was arrested. *See* Jenkins Body Camera, ECF 161, exhibit L; and Hughes Backseat Camera, ECF 161, exhibit F. They

5

argue the videos and booking photos do not show any facial injuries. *See id*.; Benson Interview Video, ECF 161, exhibit M; and booking photos, ECF 157-11 at 3-5.

When "the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007). However, none of the videos filed in this case show the moments immediately after Benson was handcuffed during which he alleges he was assaulted. Thus, they do not blatantly contradict Benson's claim he was held down and kicked in the face. Rather, as the defendants accurately note, the videos make the "claim he was kicked in the face . . . quite suspect." ECF 158 at 7. That is an argument properly presented to a jury. It is not appropriate on summary judgment.

Geiger and Drummer argue the excessive force claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) because "Mr. Benson cannot contradict his state court conviction of Resisting Law Enforcement and the facts set forth by the Indiana Court of Appeals." ECF 158 at 9.

> In *Evans v. Poskon*, 603 F.3d 362 (7th Cir. 2010), [the court] addressed the ability of a plaintiff to proceed on a § 1983 excessive force claim where that plaintiff had been convicted of resisting arrest, and held that the plaintiff can only proceed to the extent that the facts underlying the excessive force claim are not inconsistent with the essential facts supporting the conviction.

*Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). Here, the facts underlying the excessive force claim are that after Benson was passively handcuffed on the ground,

Drummer pressed his foot on Benson's neck while Geiger kicked him in the face. The essential facts related to the Resisting conviction are not explained by the Court of Appeals of Indiana. However, since the opinion omits any reference to events after Benson was handcuffed,[3] there is no indication what occurred after that was relevant to any of his convictions. Moreover, the Information charging Benson with Resisting states:

> Charles A. Benson, did knowingly or intentionally flee from Robert Geiger, a law enforcement officer empowered by the Fort Wayne Police Department, after Robert Geiger had, by visible or audible means, identified himself and ordered Charles A. Benson to stop, and while committing said offense, Charles A. Benson did draw or use a deadly weapon, to wit: a firearm, being contrary to the form of the statute in such case made and provided.

ECF 170-4 at 71. Thus, neither the Court of Appeals of Indiana opinion nor the charging Information give any indication that the excessive force claim could contradict his State court conviction. Therefore, *Heck* does not bar the excessive force claim.

Geiger and Drummer argue they are entitled to qualified immunity because "Mr. Benson kept trying to stand up when Officer Drummer was holding him on the ground." ECF 158 at 15. "A public official defendant is entitled to qualified immunity unless two disqualifying criteria are met. First, the evidence construed in the light most favorable to the plaintiff must support a finding that the defendant violated the

---

[3] The opinion finishes the factual history by saying, "Benson stumbled to the ground. Benson let go of the gun, lifted his hands, and Officer Geiger kneeled on Benson to control him. Additional officers arrived, and Benson was arrested. No one was struck during the pursuit, which lasted around ninety seconds." *Benson v. State*, 73 N.E.3d 198, 200 (Ind. Ct. App. 2017)

7

plaintiff's constitutional right. Second, that right must have been clearly established at the time of the violation." *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020).

Here, the defendants' qualified immunity argument has not construed the evidence in the light most favorable to the plaintiff. In that light, Benson was held down and kicked in the face while he was handcuffed and not resisting. "When an officer uses greater force than reasonably necessary to make an arrest, he violates the arrestee's Fourth Amendment right." *Day v. Wooten*, 947 F.3d 453, 460–61 (7th Cir. 2020). The right to be free from a gratuitous beating following arrest was clearly established by 2016. "[C]ontinued punches and flashlight blows after [the arrestee] had stopped moving is also objectively unreasonable [because] it is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him." *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007) (parentheses and quotation marks omitted). Therefore, Geiger and Drummer are not entitled to qualified immunity.

## II. FAILURE TO INTERVENE CLAIM AGAINST GEOFFREY NORTON

Defendant Geoffrey Norton denies he failed to intervene to stop Geiger and Drummer from using excessive force against Benson because he says he had no time to do so.[4] ECF 158 at 12. Benson says he yelled each time he was kicked. Benson Declaration, ECF 170-4 at 92. Drummer's vehicle dash camera recorded Benson crying

---

[4] Norton also argues he did not fail to intervene because neither Geiger or Drummer used excessive force against Benson. As explained, there is a genuine issue of material fact about whether Geiger and Drummer used excessive force against Benson.

8

out (in what appears to be pain) five times in ten seconds. Drummer Dash Video-Stream 1, ECF 80, disc 5, 14:00:55 to 14:01:05.[5] It also records Benson yelling "I can't breathe" four times in sixteen seconds shortly thereafter. *Id.* at 14:01:28 to 14:01:44. Norton acknowledges being present while Geiger was at the scene. Norton Affidavit, ECF 157-5 at 2. "[P]olice officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so [may be] held liable." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). During the forty-nine seconds[6] from the time Benson first cried out until the last time he yelled he couldn't breathe, Norton could have had a realistic opportunity to intervene. Because of the contradictory statements by the parties about what happened during those forty-nine seconds, there is a genuine issue of material fact as to the failure to intervene claim which cannot be resolved on summary judgment.

### III. DENIAL OF MEDICAL TREATMENT CLAIMS AGAINST CARY YOUNG, PAUL A. SHRAWDER, AND SHANNON HUGHES

Defendants Cary Young, Paul A. Shrawder, and Shannon Hughes deny they "unreasonably den[ied] Mr. Benson medical care" for more than five hours on January 30, 2016. ECF 158 at 12. Benson does not dispute the accuracy of the numerous police videos of these events. ECF 170-3 at 20. He accurately notes where "the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving

---

[5] Many of the videos have a display showing the time of day using the 24 hour clock. For consistency, this opinion uses the same notation.

[6] Benson speaks freely thereafter. He does not cry out nor complain about an inability to breathe for the next several minutes. Drummer Dash Camera-Stream 1, ECF 80, disc 5; and Hughes Dash Camera-Stream 1, ECF 80, disc 5. Therefore it is undisputed the alleged excessive use of force must have ended by 14:01:44 at the latest.

party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007). Here, the undisputed facts and the videos demonstrate these three defendants did not unreasonably deny Benson medical care.

### A. Relevant Medical Events on January 30, 2016

Paramedics arrived at the scene where Benson was apprehended, behind 923 Lewis Street, at 14:08:03. Hughes Dash Video-Stream 1, ECF 80, disc 5. After finishing their examination, he was released for transport at 14:12:24. Barely twenty seconds later, as he was walking to Hughes' police car, Benson asks the police to take him to the hospital. Drummer says him he will be taken to the hospital. ECF 170-2 at 4; ECF 170-4 at 66; Jenkins Body Camera, ECF 161, exhibit L; and Hughes Dash Video-Stream 1, ECF 80, disc 5. Benson says he "complained about pain and that I couldn't breathe all the way to Officer Shannon Hughes squad car." Benson Declaration, ECF 170-4 at 92. However, audio of the less than 90 second walk to the car records a brief conversation where Benson asked Hughes what was going on, but he makes no mention of any medical problems at that time. Hughes Dash Video-Stream 1, ECF 80, disc 5.

Moments after he is seated in the car at 14:14:29, Benson complains about having a dry mouth and being unable to breathe. ECF 170-4 at 92-93; ECF 157-4 at 2; Hughes Dash Video-Stream 1, ECF 80, disc 5; and Hughes Backseat Camera, ECF 161, exhibit F. Hughes explains the windows were rolled down so he has fresh air. She then spoke to him about his medical concerns for a minute before she goes for assistance. Less than two minutes later, she returns with a paramedic who checks his pulse and blood

10

pressure, confirms his lungs are clear, determines that he is stable with normal vital signs, and releases Benson for transport to the jail at 14:18:54. *See* Paramedic Report, ECF 157-10 at 4. As soon as the paramedic closes the car door, Benson again tells Hughes his mouth is dry and asks for water. Hughes Backseat Camera, ECF 161, exhibit F. Hughes explains he cannot have water at that moment and tells him to stop talking because it is only making his mouth drier. For the next six minutes, Benson can be seen on the video sitting alone in the car, sometimes slumped over. Hughes gets back in the car at 14:25:06 and drives to the Detective Bureau, arriving 14:31:26. During the ride, Benson is sometimes sitting up and sometime slumped over. He says he lost consciousness during the roughly six minute drive. ECF 170-2 at 8. Based on the video it is possible, but not clear, that he fell asleep. Hughes Backseat Camera, ECF 161, exhibit F. It is undisputed he had dry heaves and spit up on his shirt, but the quantity was insufficient to be seen on the backseat video. *See also* Hughes Supplemental Narrative, ECF 170-4 at 43.

Once at the Detective Bureau, Hughes secured Benson in interview room 4, activated the video recording, and stood by during the interview. Hughes Affidavit, ECF 157-4 at 3. The video of Benson in the interview room begins at 14:37:52. Benson Interview Video, ECF 161, exhibit M. At that time, Benson is in the room alone. He is handcuffed in a chair with his head laying on the table. During the next hour, he alternates between sitting up and laying his head on the table. He dry heaves several times. It is undisputed that he spit-up, but the volume is not large enough to be seen on the video.

11

At 15:37:54, Benson shouts twice that he needs to use the restroom. Benson Interview Video, ECF 161, exhibit M. Seconds later, Hughes enters the room. Benson tells her he needs water and another person immediately sets a bottle of water on the table. Benson tells Hughes he needs to go to the hospital because his hand is cut off. She confirms his hand is still attached while she removes his handcuffs. He tells her someone needs to look at his wrists and that he has been spitting up on the floor. She says they are watching and recording him in the interview room. Two minutes after he asked to use the restroom, he rubs his left wrist as he leaves the interview room to do so. At 15:41:48, he returns to the interview room. Benson asks about water and Hughes tells him the bottle of water on the table is for him while another person removes the bottle cap and sets the bottle back in front of him. Benson says this is the first time he had been given water since he asked for it when he was in the police car one and a half hours earlier. ECF 170-2 at 3. Nevertheless, he does not drink from the bottle for another three and a half hours. Even then, he takes only one small sip at 19:06:32 just before he is escorted out of the interview room.

Benson was then alone in the interview room without handcuffs for the next one and a quarter hours. Benson Interview Video, ECF 161, exhibit M. During this time he mostly sits hunched over, but he moves, fidgets, raises his head, and lays it on the table occasionally. Cary Young interviewed Benson. Young Affidavit, ECF 157-6 at 2. Benson argues he was left unmonitored, unconscious, and choking during the two and a half hours he waited in the interview room before Young arrived to start the interview. ECF 170-3 at 18. Video of him in the interview room proves he was not choking. Benson

12

Interview Video, ECF 161, exhibit M. It also proves he was not continuously unconscious. Though he may have sleep during some of that time, the video shows him conscious and active on many occasions. Moreover, he has provided no evidence to support his speculation that he was unmonitored during any of this time. However, even if he was unmonitored, nothing on the video indicates he was in need of medical attention during that time.

Young entered the room for the first time at 16:59:24. Benson Interview Video, ECF 161, exhibit M. He asked if Benson was okay and if he wanted a snack. Benson said he was cold and feeling sick. He described having thrown up and being so sick he had been unable to talk. He acknowledged being checked by medics, but said he did not believe it was adequate. Despite saying he was feeling sick, nothing about his condition at that time nor his description of past events indicate that he was in need of immediate medical attention. Young left and returned at 17:01:53. He began the interview by noting Benson had been examined by medics twice earlier that day. Benson responded the paramedics only checked his respiration even though they are seen on video doing more during both examinations. *See* Jenkins Body Camera, ECF 161, exhibit L; and Hughes Backseat Camera, ECF 161, exhibit F.

Paul A. Shrawder observed Young interview Benson. Shrawder Affidavit, ECF 157-7 at 2. During the interview, at 17:19:26, Benson first mentions having been subjected to physical abuse by the police, but he makes no mention of having any current injuries that need medical attention. Benson Interview Video, ECF 161, exhibit M. At 17:25:20, as Young is leaving the room, Benson asks to be seen by a nurse, but

13

does not say why. During the nearly half hour while Young was gone, Benson appears to be resting most of the time by leaning forward and eventually resting his forehead on the table. Young returns at 17:51:34 and continues the questioning. At 18:04:42, Benson says he is "still kinda feeling sick." Young asks what he thinks is wrong and Benson says he is not sure but his back was hurting when he was on the ground during the arrest. About a minute later, he says the medics who examined him did not take him to the hospital, but he did not explain why they should have. Neither did he ask Young to take him to the hospital at that time.

At 18:10:56, he rubs his face, groans softly, and says "I need my nose checked out, I got a crooked nose." Young immediately responds saying, "Well hold on just a minute then okay?" He leaves and returns less than five minutes later asking if Benson wants to have the medics come examine him again. Benson says yes and the medics arrive 20 minutes later at 18:35:50. Minutes before they arrive, Benson describes his current symptoms to Young for the first time: "I got a bad headache, I'm starting to get a headache, my nose is starting to get sore, my jaw is worse, *I'm just now starting to feel all this*." Benson Interview Video, ECF 161, exhibit M (emphasis added).

When the medics examined Benson, they found no swelling or discoloration of his jaw. ECF 157-10 at 8. They found all his teeth were intact. They found "some swelling and redness to the bridge of his nose." *Id*. They did not find any bleeding. There was "no airway compromise noted." *Id*. They found Benson was "able to speak clearly and able to open mouth without any problem." *Id*. Nothing in the video of the

14

examination contradicts any of their written findings. Benson Interview Video, ECF 161, exhibit M, 18:35:50 to 18:49:15.

As the examination was concluding, the medic explained, "Right now, from what I can see, you look like you're doing okay." Benson Interview Video, ECF 161, exhibit M. "Everything's checking out just fine." The medic explained there is nothing that can be done for a broken nose unless it needs to be reset, but Benson's nose did not appear to have that severe an injury. Benson agreed the paramedics had done a good job examining him. The medic explained "we don't need to transport you to the hospital right now." Benson never asked the medics to take him to the hospital. For the rest of the interview, there is no further discussion of medical issues. After the interview ends, at the request of Shannon Hughes, Detective Chris Schubert and Officer James Spangle transported Benson to the Hospital at 19:12. Schubert Affidavit, ECF 157-8 at 1.

At 19:27, Benson arrived at the hospital. Benson Emergency Department Chart, ECF 170-4 at 76. He did not appear to be in distress and his nose was not visibly deformed, though it did have some mild swelling and some dried blood in his left nostril. *Id.* at 77. The skin on his nose had "no significant lacerations or abrasions." *Id.* at 78. After a head CT, he was diagnosed with a fractured nose, but no jaw injury other than mild swelling on the right side. *Id.* at 77 and 79. Both wrists had "some redness [but] full range of motion . . .." *Id.* at 77. He was found to be "[w]ell hydrated with moist mucous membranes." *Id.* at 77. After finding he had "No emergency medical condition," he was discharged. *Id.* at 79. Benson was examined at the hospital, but he received no medical treatment other than acetaminophen and ibuprofen. *Id.* at 78.

15

B. Legal Analysis

To prevail on a Fourth Amendment claim for a denial of medical care, Benson must show the "response to [his] medical needs was objectively unreasonable, and that [the] response caused harm." *Horton v. Pobjecky*, 883 F.3d 941, 953 (7th Cir. 2018). Here, Benson satisfies neither prong of the test. The defendants' response to his medical needs was reasonable, and he did not suffer any harm as a result of waiting a few hours to go the hospital.

> [The] four factors to determine whether an officer's actions regarding medical care were objectively unreasonable [are]: (1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment. The Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment.

*Horton v. Pobjecky*, 883 F.3d 941, 953 (7th Cir. 2018) (citation, quotation marks, and brackets omitted).

Benson was seen by paramedics within minutes of his arrest. They determined he did not need further medical treatment and released him. He immediately asked to go the hospital, but did not say why. Without information about why he needed to go to the hospital, the defendants were not on notice of a serious medical need given that he had just been released by paramedics.

Minutes later, he complained of a dry mouth while in the police car. Water was not available and Benson objects that he was not given access to water for one and a half hours. However, when he asked for it in the interview room, he was given water immediately. Nevertheless, he did not drink any of it until the end of the interview

16

when he took only a small sip. Moreover, the emergency room physician later found that he was well hydrated. Therefore he did not have a serious medical need for water.

At the same time he asked for water, he said he was unable to breathe. Hughes made sure the car windows were down so he could get fresh air. Within minutes she had the paramedics checking him again. Hughes response was objectively reasonable. Though Benson objects because the paramedic only took his vital signs and checked his respiration, since his complaint was only about being unable to breathe, they had no reason to check him for other medical problems only minutes after they had already examined him more thoroughly.

In the interview room, Benson told Hughes he needed to go to the hospital because his hand was cut off. He asked for someone to look at his wrists. Hughes removed his handcuffs and observed his wrists while doing so. Benson rubs his left wrist, but does not mention any problem with either wrist again. Without providing additional information about his need for medical treatment related to his wrists, the defendants were not on notice he had a serious medical need. Moreover, the emergency room physician found no injury to his wrists other than redness.

At the same time he said his hand was cut off, he told Hughes he had been spitting up on the floor. At other times during the interview, he told Young he had been having dry heaves and spit up on his shirt. At none of these times did he request medical treatment and he was not still spitting up. Benson was not visibly in need of immediate medical attention and the defendants were not on notice that he had a

17

serious medical need. Moreover, the emergency room physician made no findings related to vomiting.

At the beginning of the interview, Benson told Young he felt sick. However, he did not request medical treatment nor otherwise mention any current symptoms. Rather, he described past events and how he had been examined by the paramedics only hours earlier. Shortly thereafter, he described being assaulted by the police, but again did not say he had any current injuries nor ask for medical attention. Later, he asked to be seen by a nurse, but did not say why. A half hour after that he said he was "kinda feeling sick" and explained his back was hurting when he was on the ground during the arrest. However, Benson had no significant visible injuries. His behavior did not indicate he was in distress. The defendants did not act unreasonably because they were not on notice Benson had a serious medical need. This was confirmed by the emergency room physician only hours later upon discharging Benson without any treatment other than a mild pain reliever and anti-inflammatory.

After three and a half hours in the interview room, Benson rubs his face, groans softly, and says "I need my nose checked out, I got a crooked nose." This specific request for medical treatment for a current medical problem yielded a prompt response. Medics were called. Benson had not previously presented a current, specific medical problem. He said, *I'm just now starting to feel all this*. Because the medics who examined him determined he did not have a serious medical need that needed prompt attention, the defendants response cannot have been objectively unreasonable. Benson did not ask

the medics to take him to the hospital and they determined there was no immediate need for him to go.

At no time did Young, Shrawder, or Hughes unreasonably deny Benson medical treatment. Moreover, based on the undisputed findings by the emergency room physician, Benson suffered no harm as a result of waiting five hours before going to the hospital. Therefore summary judgment must be granted in favor of the defendants as to the denial of medical treatment claims against Cary Young, Paul A. Shrawder, and Shannon Hughes.

## IV. PUNITIVE DAMAGES

The defendants argue Benson may not proceed on a claim for punitive damages because he cannot show their actions were motivated by evil intent. Motivation is not an element of the Fourth Amendment claims. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (The objective reasonableness of defendants' actions is determined "without regard to their underlying intent or motivation."). However, "[p]unitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *G.G. v. Grindle*, 665 F.3d 795, 800 (7th Cir. 2011) *quoting Hagge v. Bauer*, 827 F.2d 101, 110 (7th Cir.1987).

As to Young, Shrawder, and Hughes, this argument is moot because the claims against them are being dismissed. However, as to Geiger, Drummer and Norton, there are genuine issues of disputed fact as to what happened during the forty-nine seconds when it is alleged Drummer pressed his foot on Benson's neck while Geiger kicked him in the head and Norton stood by and watched. If Benson can prove those allegations, he

19

may also be able to prove they were motivated by evil intent. *Cf. McCottrell v. White*, 933 F.3d 651, 667 (7th Cir. 2019) ("[C]onstruing the facts in favor of the plaintiffs . . . gives rise to an inference of malice and sadism . . .."). Therefore Benson may continue to proceed against Geiger, Drummer and Norton for punitive damages.

## V. MOTION TO STRIKE THE SUR-REPLY

The Defendants' filed a motion asking to strike Benson's sur-reply because he was not granted leave to file it. The court has reviewed the sur-reply, but the ruling on the summary judgment motion would not have been different without it. Therefore the motion is moot.

## VI. CONCLUSION

For these reasons, the court:

(1) DENIES the summary judgment motion (ECF 157) as to the excessive force claims against John Drummer and Robert Geiger;

(2) DENIES the summary judgment motion (ECF 157) as to the failure to intervene claim against Geoffrey Norton;

(3) GRANTS the summary judgment motion (ECF 157) as to the denial of medical treatment claims against Cary Young, Paul A. Shrawder, and Shannon Hughes; and

(4) DENIES AS MOOT the motion to strike (ECF 177).

SO ORDERED on July 20, 2020

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT